## In re SWIFT et al.

## HUTCHINSON v. DEE.

(Circuit Court of Appeals, First Circuit. December 6, 1901.)

### No. 372.

1. BROKERS—RELATIONS TO CUSTOMER—PURCHASE OF STOCKS ON MARGIN.

The usual relations between a broker and a customer, for whom he has purchased stock on a margin, are not those of pledgee and pledgor, but of parties to an executory contract for the sale and purchase of the stock, under which the broker is bound to deliver the stock purchased on demand and payment of the amount due thereon, and entitled to claim payment on a tender of the stock after reasonable notice to the purchaser.

2. BANKRUPTCY—PROVABLE CLAIMS—BREACH OF CONTRACT.

When a broker makes a general assignment, or is adjudged a bankrupt, a demand and tender are not necessary to enable the customer to assert a breach of the broker's contract; but, as an assignment may be only a temporary expedient to tide over the broker's difficulties, both parties may unite in regarding it as such, so that the customer may treat the subsequent bankruptcy as the breach, in the absence of any tender of performance by the trustee within a reasonable time. and, thereupon, the customer's damages will be determinable as of the date of the petition in bankruptcy.

**8. SAME—TIME OF ACCRUAL OF CLAIM.**

It is not essential to the right to prove a claim against the estate of a bankrupt that it should have existed prior to the bankruptcy, but, where the filing of the petition in bankruptcy itself operates as a breach of an executory contract because equivalent to a refusal to perform, the other party may prove his claim for damages as one existing at the time of the filing of the petition.

Appeal from the District Court of the United States for the District of Massachusetts.

Freedom Hutchinson and Albert S. Hutchinson, for appellant.

Bancroft G. Davis, for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This is an appeal by a trustee in bankruptcy against an allowance of a proof of debt by the district court for the district of Massachusetts, sitting in bankruptcy. 105 Fed. 493. The bankrupts were stockbrokers, doing business at Boston, and the transactions out of which the proof of debt arose were all there; so that they are governed by the law of Massachusetts as ascertained by the rules which the federal courts have for determining the laws of the several states, in accordance with section 721 of the Revised Statutes.

The creditor, Dee, was a customer of the bankrupts in their business as stockbrokers. The proof of debt claims $8,367.65, alleging, in substance, the consideration to be certain shares of stock bought and held for Dee by the bankrupts, and for which the bankrupts were accountable to him, deducting from the value of the stocks $2,782.35, remaining due from Dee to the bankrupts on account of the purchase of the stocks. The case shows that, as we have already said, Dee was a customer of the bankrupts; that the bankrupts were doing business as stockbrokers in Boston, and followed the usual practices of brokers in buying stocks for their customers and carrying the same on margins; that Dee had on several occasions dealt in stocks with the bankrupts; and that the bankrupts had at times pledged some or all of the stocks purchased on Dee's orders with various banks as collateral for loans, though whether such pledges were with Dee's consent or knowledge the record does not disclose. It also appears that while the petition in bankruptcy was filed by the bankrupts on April 6, 1900, followed by an adjudication on May 7, 1900, the bankrupts, on December 27, 1899, made a voluntary assignment for the benefit of their creditors, and at the same time prepared and gave notices thereof to their various customers; and that on or about January 10, 1900, one of the bankrupts wrote a letter to Dee, alleging that there were prospects of a favorable settlement; and that on January 15, 1900, Dee replied as follows:

"Houghton, Mich., Jan. 15, 1900.

"(Personal.)

"Mr. E. C. Hodges, 53 State Street, Boston, Mass.—Dear Mr. Hodges: I have your favor of the 10th, and note what you say about the prospects of favorable settlement, although you at the same time speak rather doubtful

as to the probable outcome, and that it may be a long pull, which is not the most encouraging; but I suppose we will have to wait, whether it is to be long or short pull. Hoping things will come out as well as you expect, I remain,

"Yours, truly, James R. Dee.
"Ans. Jan. 18/00."

The record does not give either a copy or the substance of the answer of January 18th.

Dee never became party to the assignment.

The proof of claim was sent to a referee, and the parties appeared before him, and submitted only one issue; that is to say, whether the date of the voluntary assignment or that of the commencement of proceedings in bankruptcy govern in determining the value of the stocks, and therefore the amount of the proof to be allowed. Their value at the time of the assignment was less than their value at the time of the filing of the petition in bankruptcy. The district court accepted the later date, thus giving Dee the larger sum. Consequently the trustee appealed, and it is this appeal which we now have under consideration.

The parties have attempted to shift before us somewhat from the positions which they took below, but the attempts prove to have been in vain. On the one hand, it is claimed by the trustee that if Dee's position is correct, to the effect that the value is to be assessed as of the time of the commencement of the bankruptcy proceedings, there was then no provable debt. Of course, if the liability of the bankrupts accrued as of the time of the voluntary assignment, this proposition does not become pertinent, because the claim would have been perfected a long time before the bankruptcy proceedings were commenced; but, even if not so, it is not tenable, as we will see further along.

On the other hand, the creditor claims that, if the trustee prevails on appeal, the rule of Galigher v. Jones, 129 U. S. 193, 201, 202, 9 Sup. Ct. 335, 32 L. Ed. 658, applies. This is, in effect, that, on a default by a stockbroker in failing to deliver, the rule of damages is to be determined according to the highest intermediate value between default and a time after the purchaser receives notice thereof reasonably sufficient to enable him to replace the stock. In the court below, however, the creditor made no proposition of this character, and no evidence or finding has been called to our attention as to what would have been a reasonable time within which to replace the stock, or as to the precise time between the assignment and the commencement of proceedings in bankruptcy at which the highest market value existed. In any event, we are justified in holding each party to the position he took below.

In order to understand correctly those positions, it is necessary to determine the nature of the relations between a stockbroker and his customer under the circumstances of the case at bar. The hearing in the district court, and also that before us, raised questions whether such relations are those of pledgor and pledgee or of parties to an executory contract to deliver stock. If they had been strictly those of pledgor and pledgee, with all the consequences involved in the law of pledges, there would have been a question of

conversion and of the rule of damages with reference to the time thereof. The proof of debt excludes any such rule of damages. Moreover, the law, with its modifications arising out of the usages governing the relations of stockbrokers to their customers, leaves no practical question of this nature.

It seems to be settled in Massachusetts that the relations between the parties in this case were, in no sense, properly those which exist between pledgors and pledgees. In Wood v. Hayes, 15 Gray, 375, 378, transactions of the character at bar are said to stand on the footing of a contract to deliver so many shares on the payment of so much money. There was much discussion before us, and in the district court, whether or not this rule is peculiar to Massachusetts; but it is so only in name, and not in substance. The courts in New York use somewhat qualified language, and nominally describe the relations as those of pledgors and pledgees; but the substantial condition is the same there as in Massachusetts. In Caswell v. Putnam, 120 N. Y. 153, 24 N. E. 287, in which there was a claim by a customer against stockbrokers for the alleged conversion of shares of corporation stock, purchased by them for the customer, it was held that the brokers should have been allowed to prove that they had on hand, or under their control, a sufficient amount of the stock of the class in question to meet a demand by the customer for the amount which the brokers were carrying for his account. The practical condition of the law in New York is clearly explained in Douglas v. Carpenter (Sup.) 45 N. Y. Supp. 219, 220, where, speaking of stockbrokers, it is said:

"Their duty was to keep on hand, or under their control, either the securities of the defendant [that is, the customer], or a like kind and amount of securities, and to have them in such situation that the defendant, by paying the amount due by him thereon, could at once at any time obtain them." "So long as they did this, the fact that they used the securities while in their possession, awaiting redemption by the defendant, would not amount to a conversion thereof."

This is more fully stated by Patterson, J., in his concurring opinion, beginning at page 222. Of course, such propositions are wholly inconsistent with the relations of pledgor and pledgee, according to their proper understanding. Further authorities are cited in Cook, Corp. (4th Ed.), in the notes to section 469. We accept the law as well settled, alike by local usage in Massachusetts, where the dealings took place, and by the implied necessities of public transactions in stocks, as well as by general acquiescence and sound sense, that the ordinary relations between stockbrokers and their customers are executory for the sale and purchase of stock. We have, therefore, to deal with an agreement by which the bankrupts bound themselves to deliver certain stocks to Dee on payment of the balance due from him to them, and by which also the bankrupts were entitled, on reasonable notice, to tender the stocks to their customer and claim like payment. But neither party fulfilled the ordinary conditions applicable to such relations. Neither made a demand or tender. Consequently, according to the ordinary rules of law, no cause of action arose in favor of either party against

the other. The position is one, therefore, to be solved by the law itself. The case has no relation to any question of the rights of either party, or the representative of either, including the trustee in bankruptcy, to make a demand and tender at any time, either prior or subsequent to a voluntary assignment or the beginning of proceedings in bankruptcy. Whether a demand and tender made after such an event would have laid the foundation for a provable claim, or for one which would have been discharged by bankruptcy, we need not determine, although it seems settled that, if an uncompleted contract of purchase and sale appears to be to the advantage of an estate, the trustee may, within a reasonable time, perform what the bankrupt should have performed, and thus secure the benefit to come therefrom. Whatever may be the condition in a case of bankruptcy, it is certain that no result which we will reach in this case will establish that any stockbroker can, by making a voluntary assignment for the benefit of his creditors, force his customer to any precise date of liquidating his account, although, of course, he may, by virtue of the assignment, withdraw his present assets from the customer, unless he assents to the assignment, leaving his customer to make a demand and.tender at some future time, and to hold for future developments the claim thus established.

As we have already said, the solution of the proper relations of the parties in this case growing out of the assignment, or out of the filing of the petition in bankruptcy, is fixed by the law; and the simple rule, based on fundamental principles, and traceable in the text writers and decisions of the courts for fully a century, must be applied, to the effect that, "where a man has disabled himself from performing his contract, it is unnecessary to make any request or demand for performance." Chit. Cont. (11th Am. Ed.) 1073. This rule was stated and applied in the reports as early as 1819, in Newcomb v. Brackett, 16 Mass. 161, 166, where it was said that the defendant had conveyed to a stranger land which he had promised to convey to the plaintiff, and that thus he had excused the plaintiff from making a tender, and entitled him to damages for breach of contract. It was also laid down in the broad language of Chitty on Contracts, in Lovell v. Insurance Co., 111 U. S. 264, 274, 4 Sup. Ct. 390, 28 L. Ed. 423. Indeed, it is such an ancient rule, and so universally recognized, as to need no citation of authorities to justify its application in this case, where, as we have said, neither party has done any act ordinarily necessary to entitle him to enforce the contract, or recover damages for its breach, but each has left the mutual relations to be worked out by the law.

These propositions may be made somewhat clearer by comparing the position of a banker with that of a stockbroker. A banker has not, ordinarily, on hand sufficient funds to meet the checks of all his depositors if they should all draw simultaneously, and he is not expected to do so. A like rule applies to stockbrokers. In the one case as well as in the other, so long as either remains solvent, he is presumed to be able to meet his contracts; and no action can be maintained against a banker by a, depositor without first drawing a check or making some other proper demand, nor, in the case of a

stockbroker, without a tender by his customer of the balance due him, and a demand of his stock. On the other hand, when either has made a voluntary assignment for the benefit of creditors, or gone into bankruptcy, or, perhaps, when he has committed some other notorious act of insolvency, he has parted with the control of his assets, and the law assumes, as is the fact, that his ability to perform his contracts has terminated, and that a demand and tender would be futile, and, ordinarily, an action may at once be brought. All this, of course, is subject to the rights, which we have already stated, of a trustee in bankruptcy, or other representative of an insolvent, to rehabilitate the contract within a reasonable time, if it is for the interest of the estate so to do. These are the simple principles which, in the absence of a demand or tender by either party, the law necessarily applies to the case at bar, and the only doubt is whether the disenabling of the present bankrupts to perform their contract arose at the time of the voluntary assignment or out of the proceedings in bankruptcy.

Dee calls our attention to Bryan v. Bernheimer, 181 U. S. 188, 21 Sup. Ct. 557, 45 L. Ed. 814, and maintains that, in view of that decision and of the subsequent bankruptcy, the assignment in this case was not effectual. It probably will be sufficient to observe that the question whether the necessity of a demand is obviated by the law is not disposed of by any such refinements. Whatever the nature of the act of the party who is to perform, if it renders it in fact impracticable for him to do so, it is probably sufficient on this topic. On the other hand, the appellant maintains, not only that there was an assignment for the benefit of creditors, but that all the stocks which the bankrupts had agreed to deliver, or could have delivered, of the classes to which he was entitled, were sold out immediately thereafter by the bankers to whom they were pledged, and were thus effectually put beyond the reach of the brokers. We need not, however, consider further any of these propositions, nor consider further in any way the effect of the voluntary assignment, because the correspondence which we have already cited makes it clear that both the bankrupts and Dee in effect agreed to regard the assignment as not definitive, and that each held everything in abeyance until the decisive blow was struck by the proceedings in bankruptcy. In this particular we agree that the matter was well expressed by the referee, in substance, that voluntary assignments are frequently resorted to as expedients to tide debtors over their difficulties, and intended to be merely temporary, that the letters referred to indicate that this case falls within that observation, and that the parties waived for the time being insistence on the performance of the existing contracts. Therefore the rights of the parties, as fixed by the law, necessarily relate to the bankruptcy proceedings.

This leaves only one question which was raised before us. In view of what we have stated of the position of the parties in the district court, it may well be doubted whether it is properly raised; nevertheless, we may well not overlook it. It is maintained that, unless the voluntary assignment operated to ripen the claim, it was not ripened in season to become provable. With reference to stat-

utes of bankruptcy, there are contingent demands, and also engagements of such a character that it remains uncertain whether they will give rise to an actual liability, and as to which there are no means of removing or valuing the uncertainty by any calculation. Each class is sufficiently described in Riggin v. Magwire, 15 Wall. 549, 21 L. Ed. 232, without referring to other authorities. Under some bankruptcy statutes, provision was made for liquidating the present values of contingent debts and contingent liabilities, for provable purposes. Rev. St. § 5068. But the present statute does not expressly provide any machinery for that purpose. It provides, without apparent restriction, for proof of debts founded on contracts, express or implied, and also, in a general way, for liquidating unliquidated claims; but, in the absence of any express provision for contingent engagements, including those for property to be delivered on demand and payment of purchase money, there seems to be some difficulty in applying the statute. However, we need not go into the troublesome questions that are raised by this omission, because we have already seen that in the case at bar the proceedings in bankruptcy rendered unnecessary a demand and tender, and, like the great mass of matters affected by such proceedings, we must hold that this proof of debt relates to the time when they were commenced. From that time the stocks in question were put beyond the power of the stockbrokers to deliver effectually. The contract ripened simultaneously with the beginning of the proceedings in bankruptcy, as the consequence thereof in connection with the adjudication which followed. Of course, as everything related back to the filing of the petition, the ripening of the claim did not occur before it was filed, nor afterwards, but simultaneously with it, as already said. Consequently, by necessary effect, there was created and existed, when the proceedings commenced, a provable claim. Whether Dee had the option of withholding his claim and ripening it by a demand subsequently,—a matter to which we have already referred,—he waived that option by his proof of debt, and he thus elected, as he had a right to do, to assume that demand and tender had been rendered unnecessary, and to liquidate his claim accordingly, subject to the right of election on the part of the trustee to rehabilitate the contract which we have already referred to, but which is of no importance in this case, as no such right was exercised.

The trustee maintains that the form of proof prescribed by the supreme court requires that it should state that the debt proved existed "at and before the filing" of the petition for adjudication of bankruptcy; but, in view of the statute, this must be construed, as is commonly done, to give such effect to the word "and" that it may read either "or" or "and," as circumstances may require. That part of the present bankruptcy act which describes what debts may be proved does not repeat at all points the words "owing at the time of the filing of the petition," but it is impossible to consider it other than as though it did thus repeat them. There can be no question that it is sufficient if the debt existed at the point of time of the filing of the petition in bankruptcy.

The appellant relies also on a class of cases of which Ex parte Halliday, 2 De Gex, J. & S. 312, is one. This was decided in 1865, and it was shortly after followed by some other decisions, which reaffirmed it. None of them can be accepted unless in the light of the later decisions, which announced the rule of the right to rehabilitate to which we have referred, and which so limited Ex parte Halliday, and other cases of that class, that the latter must be regarded as merely holding that an agreed vendor cannot, immediately on the bankruptcy of the purchaser, sell out the merchandise under contract, without giving the trustee a reasonable opportunity to complete the purchase if he desires. Indeed, all the late authoritative decisions in England state the law as we have given it. If they have not used the same terms as used by us, it is merely because they approach the subject from a different standpoint. Evidently the master of the rolls, then Sir George Jessel, took this view of the law in Re Northern Counties of England Fire Ins. Co., 17 Ch. Div. 337, 341, decided in 1880, where he said:

"No doubt a man with whom a contract has been entered into may, in certain cases, treat a declaration of insolvency, or an adjudication in bankruptcy, of the other party to the contract as a refusal to perform the contract, and may, at his election, treat it as a breach of contract."

In that particular case, which related to a fire policy, it was held, under the special provisions of the English statute in question, that the holder of the policy might prove for the full amount of a loss covered by it, which occurred after winding-up proceedings had been commenced. It was explained that the proceedings were, for all the purposes of the case, the same as proceedings under the bankruptcy acts. Nevertheless, the expression of the master of the rolls which we have cited, in connection with what else appears, leads to the conclusion that he had no doubt that, independently of special statutory provisions, the contracting party, in this case the holder of the policy, was entitled to elect to treat it as terminated by the beginning of the winding-up proceedings, and therefore as furnishing a provable claim thus simultaneously created.

In Ex parte Stapleton, 10 Ch. Div. 586, 590, decided by the court of appeal in 1879, with reference to the rights of an agreed vendor of goods against an agreed purchaser who became bankrupt, it was again said by Sir George Jessel, also then master of the rolls, referring to the effect of a declaration of the purchaser that he had parted with all his property, and was unable to pay the price agreed on:

"Of course, that would not affect the right of the trustee in the liquidation to elect to fulfill the contract on paying the price in cash, provided that he does so within a reasonable time. But, if he does not do that, I think that the vendor is entitled to treat the contract as broken, without making any tender of the goods to the trustee."

Practically, this language of Sir George Jessel is found in that portion of section 759, Benj. Sales (7th Am. Ed.), which was written by the editors of the last previous English edition; and exactly the same language is found in Williams, Bankr. (7th Ed., 1898) 196, this being the most conclusive authority on the present condition of the

law in England. It is to be noticed that what is thus said expressly states that a tender is unnecessary, which could not be unless rendered unnecessary by the legal effect of bankruptcy proceedings, on the rule which we have explained.

The whole case is substantially summed up in the language of Mr. Justice Bradley, referring to a life insurance company which had gone into liquidation, in Carr v. Hamilton, 129 U. S. 252, 256, 9 Sup. Ct. 295, 32 L. Ed. 669, wherein he applied substantially the same practical rule as was applied in Re Northern Counties of England Fire Ins. Co., ubi supra, and said: "By that act the company becomes civiliter mortuus, its business is brought to an absolute end, and the policy holders become creditors to an amount equal to the equitable value of their respective policies, and entitled to participate pro rata in its assets."

On the whole, we are of the opinion that the decision of the district court was correct.

The decree of the district court is affirmed, and the costs of appeal are awarded to the appellee.